UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOYLE WAYNE DAVIS, CDCR #34318,<br><br>Plaintiff,<br><br>v.<br><br>DANIEL PARAMO, Warden, et al.,<br><br>Defendants. | Case No.: 16cv689 BEN (JMA)<br><br>**REPORT AND RECOMMENDATION RE DEFENDANTS' MOTIONS TO DISMISS PLAINTIFF'S COMPLAINT**<br>**[ECF Nos. 22, 24, 46, 61]** |

Plaintiff Doyle Wayne Davis is a state prisoner proceeding pro se and in forma pauperis in this civil rights action filed pursuant to 42 U.S.C. § 1983. Plaintiff contends fourteen correctional and medical care officials at Richard J. Donovan Correctional Facility ("RJD") and two doctors from Alvarado Hospital acted with deliberate indifference to his serious medical needs and retaliated against him after he filed a San Diego Superior Court case and various inmate grievances challenging his medical care.

Presently before the Court are motions to dismiss filed by Defendant Zamudio (ECF No. 22), Defendant Butcher (ECF No. 24), Defendants Silva, Jackson, Pasha, Walker, Rodriguez, Self, Pool, Glynn, Sosa, Paramo, Roberts

1 and Stout (ECF No. 46), and Defendant Bedane (ECF No. 61).[1]

2

3 **I.    PLAINTIFF'S COMPLAINT**[2]

4          Plaintiff was transferred to RJD from the Substance Abuse Treatment

5 Facility in August 2013.  (Compl., ECF No. 1 at 13.)  He alleges that upon his

6 arrival at RJD, Defendant S. Pasha, Registered Nurse Practitioner, told him it

7 was RJD policy to discontinue all narcotic medications regardless of inmate

8 medical need.  (Id.)  In December 2013, prison physician Tamara Robinson, M.D.

9 noted that Plaintiff had been taking methadone, a narcotic used for pain relief

10 and drug addiction detoxification, since at least May 2013.  (ECF No. 1-1 at 8.)

11 Dr. Robinson preliminarily determined that long term narcotic treatment was not

12 medically necessary, but planned to conduct a full pain assessment because

13 Plaintiff's previous medical providers had conflicting opinions regarding his need

14 for pain relief.  (Id. at 8-9.)  In early 2014, Plaintiff saw Defendant D. Clifton, a

15 physical therapist, for low back, left leg, and neck pain.  (ECF No. 1-1 at 12-15.)

16          In April 2014, Defendant D. Paramo, the Warden of RJD, allegedly ordered

17 Defendant M. Stout, Correctional Captain, to house Plaintiff on B Facility, allow

18 Plaintiff to work in Prison Industry Authority, and to ensure that all stolen personal

19 property was returned to him.  (ECF No. 1 at 14.)  Defendant Stout allegedly

20 refused to allow Plaintiff to work even though he met all the California

21 Department of Corrections and Rehabilitation ("CDCR") guidelines.  (Id.)

22          In July 2014, Plaintiff filed a Petition for Writ of Habeas Corpus in the

23 Superior Court of California, County of San Diego, in which he alleged he was

24 ─────────────────

25
26 [1] The sixteenth defendant, David Clifton, Physical Therapist, has not been served in this matter.  See ECF No. 20 (summons returned unexecuted).

27 [2] Plaintiff's Complaint consists of a 39 page form complaint and attachments, docketed at ECF No. 1, as well as 231 pages of exhibits, docketed at ECF Nos. 1-1 and 1-2.  For ease of reference, the Court will refer to the document and page numbers affixed by the Court's

28 Electronic Case Filing (ECF) system when citing to Plaintiff's Complaint.

being denied adequate pain mediation as well as the opportunity to consult with a neurosurgeon for spinal injuries and/or degeneration.  (Id. at 31-34.)  In August 2014, the court found Plaintiff failed to make a prima facie showing that health care officials were deliberately indifferent to his condition, and that Plaintiff had failed to exhaust his administrative remedies on his claim that he was being denied a consultation with a neurosurgeon.  (Id.)

On August 14, 2014, Plaintiff had his first visit with Defendant J. Silva, prison physician.  (Id. at 14.)  He complained of increasing exertional dyspnea (shortness of breath) over the previous six months.  (ECF No. 1-1 at 36.)  After listening to Plaintiff's heart and obtaining an EKG, Dr. Silva diagnosed Plaintiff with atrial fibrillation (irregular heartbeat).  Dr. Silva noted that while Plaintiff did not have a history of atrial fibrillation, he did have a history of hypertension.  (Id.)  Plaintiff admitted he never took his hypertensive medication, and would continue to refuse to take any form of such medication because "he felt he was not being treated completely from a medical standpoint and felt that if he was not going to be treated completely then he does not want to be treated at all."  (Id.)  After advising Plaintiff of the risks of refusing hypertensive medication, including the possibility of death, Dr. Silva sent Plaintiff to the Triage and Treatment Area ("TTA") to be transferred to the emergency room.  (Id.)

Plaintiff was initially taken to Sharp Chula Vista, where a Cardizem (calcium channel blocker used to treat hypertension) drip was started due to atrial fibrillation, and was then transferred and admitted into Alvarado Hospital.  (ECF No. 1-1 at 39.)  There, Plaintiff alleges that Defendant Richard O. Butcher, M.D. told him he had spoken with RJD medical staff and "they told him what they wanted him to do for me."  (ECF No. 1 at 14.)  Dr. Butcher confirmed the diagnosis of atrial fibrillation, new onset, admitted Plaintiff to the telemetry floor, and continued the drip started at Sharp.  (ECF No. 1-1 at 40.)  Defendant Fernando A. Zamudio, M.D., cardiologist, examined Plaintiff at Alvarado on

16cv689 BEN (JMA)

August 15, 2014, the day after his admission.  According to Plaintiff, Dr. Zamudio told him his atrial fibrillation was mostly caused by the exercise program that RJD's physical therapist, Defendant Clifton, had placed him on, combined with methadone use, which medical staff at the CDCR had initiated.  (ECF No. 1 at 14-15.)  Plaintiff alleges that Dr. Zamudio told him that RJD medical staff had been in contact with the hospital and wanted Plaintiff off methadone and all narcotic medications.  (Id. at 15.)  Dr. Zamudio's consultation records indicate that Plaintiff's cardiac history dated back to 2011, when he experienced chest pain while incarcerated.  (ECF No. 1-1 at 42.)  He received a cardiac workup, which came out well, and had no further problems until May 2014.  (Id.)  Around that time, he noticed he was getting short of breath and his heart pounded with exertion.  (Id.)  Dr. Zamudio's impression consisted of:  (1) Probable congestive cardiomyopathy with atrial fibrillation and severe impairment of left ventricular systolic function with acute on chronic congestive heart failure, mild mitral regurgitation, mild tricuspid regurgitation, and mild pulmonary hypertension; (2) history of cigarette abuse (2 packs daily for 34 years, until 2005), history of methamphetamines (10 months per year for 20 years, until 1991), and chronic obstructive pulmonary disease; (3) history of hypertension; and (4) abnormal prostate-specific antigen (PSA) test.  (Id. at 42-43.)

Dr. Butcher prepared the following summary of Plaintiff's hospital course upon his discharge on August 19, 2014:

> The patient was placed on telemetry and did show atrial fibrillation, which was controlled.  The patient was seen by Dr. Zamudio and was taken off Cardizem drip, placed on [oral] Cardizem, Coreg (beta blocker used to treat heart failure and hypertension), and Hydrochlorothiazide (diuretic).  The patient seemed to improve; however, felt that a Lexiscan was indicated, if it were positive, the patient should have catheterization.  The patient had the Lexiscan by Dr. Camacho, read as negative.  The patient then started on Lovenox (blood thinner) as well as Coumadin (blood thinner) because of the atrial fibrillation.  The patient is stable otherwise . . . .  It was felt that

the patient could be discharged back with cardiac workup being negative . . . . The patient should lie in for the next week with no work detail. He is ambulatory. He is on regular diet. The patient should follow up in the med clinic in one to two days and have a repeat of his INR [International Normalized Ratio, used to provide information about the blood's tendency to clot] to keep it therapeutic between 2 and 3. The patient understands his illness, did request to be on DNR [do not resuscitate] status, which was done. The patient was okay for the general population. He should follow his medication reconciliation list, which has him on [C]arvedilol (beta blocker) 3,125 mg twice a day and Coumadin 60 mg total 120 mg every eight hours. He is on HydroDIURIL (diuretic) 25 mg. He is on chlorpheniramine (antihistamine) 4 mg four times a day [as needed for] allergies, he is on methadone 10 mg. He was not given that during his stay here, may be able to be discontinued. He is on one tablet two times a day. He is being followed by pain management. He is also on Prilosec (used to decrease stomach acid) 20 mg daily. The patient is stabilized to talk with the physician at Donovan.

(Id. at 46-47.)

On August 20, 2014, Plaintiff completed a Health Care Services Request Form (CDC 7362) in which he stated: "I returned from Alvarado Hosp. yesterday with heart and blood pressure meds with printed instructions. Transport staff and TTA staff refused to give me those specific medication instructions SO I REFUSE TO TAKE THOSE MEDS." (ECF No. 1-1 at 53 [emphasis in original].) In response, the triage registered nurse advised Plaintiff the pharmacy had been notified and Plaintiff's new medications would be processed "stat" and delivered that day. Plaintiff informed the nurse he had a "Merck" book and had an understanding of his new "A-fib" diagnosis. (Id.) On August 22, 2014, Plaintiff's INR was subtherapeutic, most likely due to missing three days of warfarin (blood thinner) as it was not available. (Id. at 55.) Plaintiff's INR was to be remeasured

in three days.  (Id.)[3]

On August 26, 2014, Plaintiff was seen by Dr. Silva, who Plaintiff alleges told him that his court case had been denied, that he could expect no outside help in his medical care and treatment, and that he should not be on any pain medication due to cost.  (ECF No. 1 at 15.)  Dr. Silva's treatment records indicate that while Plaintiff was willing to take Coumadin, he refused Coreg and diltiazem (calcium channel blocker used to treat hypertension) because "he was sent here for issues with his prostate and kidneys and did not get the followup that he wanted so he feels he is not getting the type of treatment that he needs and is refusing to take the mediation because of that."  (ECF No. 1-1 at 58.)  Dr. Silva reviewed Plaintiff's urologic history, ordered another PSA, and requested a CT urogram, referral to Urology for cystoscopy, and a urinalysis to evaluate for hematuria.  (Id.)  With respect to Plaintiff's atrial fibrillation, Dr. Silva noted:

> Atrial fibrillation appears now to be rate controlled; however, he refuses to take his Coreg, diltiazem, hydrochlorothiazide, and any other cardiac medication or blood pressure medication.  I had a long discussion with the patient about this and I discussed the risks of noncompliance including the risk of possible [myocardial ischemia], possible blood clot formation causing pulmonary embolism, possible stroke, and even death.  He is also at risk for worsening medical condition which can increase pain and suffering.  He stated he was aware of this and signed a refusal for any form of cardiac medication. He agrees to take the Coumadin, however.

(Id.)  With respect to Plaintiff's chronic pain:

> He has been on methadone 10 mg twice a day for chronic low back pain and severe degenerative disk disease at L5/S1.  We did not

---

[3] The INR of patients using Warfarin is regularly monitored in order to balance the risk of excessive bleeding against the risk of clotting or thrombosis.  When the INR is too high (over 4.5), the blood is too thin, whereas when the INR is too low (less than 2), the blood is too thick and there is risk of thromboembolism and associated conditions such as heart attack and stroke.  See https://www.myvmc.com/investigations/blood-clotting-international-normalised-ratio-inr/#C3 (as visited June 7, 2017).

16cv689 BEN (JMA)

have sufficient time to thoroughly review this; however, because of his atrial fibrillation and the possibility that methadone can exacerbate arrhythmias, risks of continued methadone use outweigh the benefits and, therefore, this will be [dis]continued.  He will be switched over to morphine ER 15 mg [twice per day].  Therapeutic interchange as calculated via opioid calculator calculated the morphine equivalent dose to be 25 mg daily dose; therefore, 15 mg [twice per day] should be sufficient.  A pain contract was signed and the patient was given a copy of the pain contract.  The patient stated that he was recommended to have some form of back surgery in the past.  Will plan to review his condition on the follow-up appointment regarding this.  He will be tested randomly and regularly.

(Id. at 59.)  Two days later, after Plaintiff complained that Dr. Silva had lied to him about his morphine dosage, Dr. Silva saw Plaintiff again and explained he had checked the calculation through the opioid calculator after Plaintiff had left his last appointment, and had determined the appropriate dose of morphine was 15 mg twice daily rather than 30 mg twice daily.  (Id. at 61, 63.)  Dr. Silva noted that Plaintiff wanted to go back to methadone, but because of the risks, he would refrain from prescribing this.  (Id. at 63.)  Plaintiff alleges Dr. Silva told him that if Plaintiff wanted to file more grievances against medical staff, they would discontinue all pain medication immediately.  (ECF No. 1 at 16.)  Plaintiff also alleges that contrary to Dr. Silva's calculations, the CDCR's conversion chart shows that methadone is four times stronger than morphine, and therefore Dr. Silva had not prescribed a high enough dosage of morphine for Plaintiff.  (Id.; ECF No. 1-1 at 69.)

On September 3, 2014, Plaintiff had a telemedicine custody consultation ("telemed") with Defendant Zamudio, the Alvarado cardiologist.  (ECF No. 1-1 at 71-73.)  Dr. Zamudio explained the importance of taking his medications, including the risks of acute congestive heart failure or stroke, but Plaintiff remained undecided at the end of the evaluation whether he would take them.  (Id. at 72-73.)  Plaintiff reported feeling tired all the time, being short of breath

without exertion, and awakening due to shortness of breath.  (Id. at 72.)  Dr. Zamudio felt Plaintiff should be taken to the clinic right away, but also explained there was little value in him coming to the hospital unless he took his medications.  (Id. at 73.)  Dr. Zamudio also explained the cardioversion procedure (performed to restore a normal heart rhythm), and advised that an INR of more than two was needed before the procedure could be considered.  (Id.)  Plaintiff states this was the first time he was made aware that he was being prepared for the procedure.  (ECF No. 1 at 16.)  RJD doctor Darryl Bates, M.D. noted after the telemed that he spent 20-25 minutes discussing Plaintiff's frustrations regarding his treatment, and that Plaintiff signed a refusal for his cardiac mediations despite Dr. Zamudio's recommendation to restart.  Dr. Bates reordered the medicines and explained to Plaintiff that he could restart at any time.  (ECF No. 1-1 at 74-75.)

Plaintiff saw Dr. Silva again on September 8, 2014.  (ECF No. 1-1 at 79-80.)  The medical record reflects Plaintiff was upset that he had not been told sooner that he was being prepared for defibrillation (cardioversion), and he stated he did not want it done because he had looked up the risks and benefits of the procedure in his Merck manual.  (Id. at 79.)  His INR on September 2, 2014 was 1.6, and 1.1 on August 21, 2014.  (Id.)  Plaintiff continued to refuse all cardiac medication with the exception of Coumadin, and stated the only things he wanted were to remain a DNR (do not resuscitate) and receive comfort care in the form of pain medication.  (Id.)  In his Complaint, Plaintiff claims he refused treatment due to reprisals by medical and custody staff and the mishandling of his life-sustaining medications.  (ECF No. 1 at 16.)  Dr. Silva referred Plaintiff to Mental Health for an evaluation to rule out a psychiatric condition contributing to his decision-making.  (ECF No. 1-1 at 79.)

Plaintiff alleges that Defendant Dr. K. Rodriguez, psychologist, told him "she had gone out and purchased her own malpractice insurance because of her

8

fear of liability due to the situations such as mine where she knew illegal actions were being taken." (ECF No. 1 at 16.) He also alleges Dr. Rodriguez told him that funds from inmates' care were being diverted to construction so RJD could receive American Correctional Association (ACA) accreditation in order to obtain $89 million in funding. (Id.; see also ECF No. 1-1 at 82-83.)

On September 22, 2014, Plaintiff had a follow-up visit for Warfarin monitoring, including his INR measurement. (ECF No. 1-1 at 85.) The medical record reflects that Plaintiff also underwent drug testing, which showed morphine undetected in serum, notwithstanding Plaintiff's claim that he complied with his morphine dosage daily and did not skip doses, and his urine was positive for opiates. (Id. at 87.) Plaintiff, in his Complaint, alleges he was ordered to the TTA for a blood serum draw, instead of the B Facility Clinic area as had been done in the past, and that a male lab technician, known to him only as Defendant John Doe "Jose", told him he could not draw blood samples as his license was not valid, but that he supervised a female trainee who took the lab sample from Plaintiff's arm. The female allegedly questioned whether the amount of the sample was sufficient, but "Jose" told her the worst that could happen was a negative test result, in which case Plaintiff would be retested. (ECF No. 1 at 17.) On October 2, 2014, Dr. Silva noted the following in Plaintiff's medical records:

> He claims to have pain and need for narcotics however serum testing reveals no morphine in blood. Urine testing is positive for opiates. This is strongly suggestive of diversion and a breach of the pain contract. His reports of pain is not consistent with drug monitoring. . . . Currently, there is no medical indication for continuation of narcotic medication. . . . Presently, the risks of continued prescribing of narcotics outweigh benefits due to the concern for diversion. I offered to prescribe non-narcotic alternative medication for his pain such as APAP, NSAIDS, SSRI and anticonvulsants[,] however[,] he stated "don't even bother because I won't take them." . . . . [H]e will be referred to Mental Health to assess for suicide risk prior to weaning off morphine, and also for behavioral modalities for pain management.

(ECF No. 1-1 at 87.)  Plaintiff alleges Dr. Silva told him that had he not filed grievances, perhaps he would still be receiving opioid medication.  (ECF No. 1 at 17.)  Plaintiff further alleges that notwithstanding Dr. Silva's statement to the contrary, Plaintiff had undergone drug testing previously.  (See id. at 17; ECF No. 1-1 at 89.)  Plaintiff claims that each prior drug test was within the required range.  (ECF No. 1 at 17; ECF No. 1-1 at 91-93.)  Plaintiff alleges he attempted to obtain "Jose's" last name, but Defendants Bedane, Walker, Roberts, and Glynn refused to provide it to him "in order to hide . . . illegal activity from myself in legal redress."  (ECF No. 1 at 22.)

On October 22, 2014, Plaintiff again signed a refusal for all medications.  (ECF No. 1 at 18; ECF No. 1-1 at 95.)  He told the prison pharmacist that RJD had an incompetent medical department and that he had had "enough" of the medical system at the prison.  (ECF No. 1-1 at 95.)  The following day, Plaintiff refused to leave his cell and come to a medical appointment, despite being warned that continued refusal would result in the issuance of a CDC 115 rules violations report.  (ECF No. 1 at 18; ECF No. 1-1 at 97, 99-101.)  Plaintiff alleges that Defendant Rodriguez, the psychologist, came to his cell on multiple dates and told him that medical and custody staff were attempting to make him seem disruptive to avoid liability for their unlawful acts, and were trying to push him into attempting suicide in order to rid themselves of the problems he had caused.  (ECF No. 1 at 18.)

On November 12, 2014, Dr. Silva presented Plaintiff's case in a "Mega Huddle Multidisciplinary Patient Care Conference" due to his concerns about Plaintiff's non-compliance with medications, refusal to attend medical appointments, and cardiac risks.  (ECF No. 1-1 at 103.)  Dr. Rodriguez reported that Plaintiff had refused to see her despite her efforts to see him weekly, but that he had come in for a mental health appointment that day.  (Id.)  Plaintiff

reportedly told her that he blamed the phlebotomist for his negative serum testing, in which no morphine was detected, blamed the CDCR for his cardiac condition which he felt was caused by medication the CDCR had prescribed, and planned to sue the CDCR. (Id.) Plaintiff had declined to be psychologically assessed by a graduate student, but Dr. Rodriguez stated that based on her observations, she did not believe Plaintiff was cognitively impaired or psychotic, and that he understood the risks and consequences of his refusals. (Id.) The Mega Huddle resulted in the following care plan: Plaintiff had a follow-up scheduled with his Primary Care Provider ("PCP") on November 24, 2014; nursing would provide patient education regarding adherence; ongoing collaboration between mental health, nursing, and the PCP; pharmacy would attempt to follow up with Plaintiff for further counseling and education regarding the risks and benefits of medication; and the Mega Huddle would reconvene in one month's time. (Id. at 103-04.) Plaintiff states he declined mental health testing with the graduate student as he considered it Dr. Silva's attempt at cost saving and another example of RJD's "inept" medical care. (ECF No. 1 at 18-19.)

On November 24, 2014, custody staff, allegedly upon the orders of Defendant Stout, brought Plaintiff to the clinic for his scheduled medical appointment. (ECF No. 1 at 19; ECF No. 1-1 at 106.) Plaintiff refused treatment, refused to sign the refusal form, cursed at Sgt. Strickland, Defendant Silva, and Defendant Pool, a licensed vocational nurse, and stated he did not want to be called for any medical appointments. (Id.)

The Mega Huddle reconvened on December 10, 2014. (ECF No. 1 at 19; ECF No. 1-1 at 108.) Dr. Walker recommended that Plaintiff be scheduled with his PCP every thirty days, even if Plaintiff refused these appointments. (ECF No. 1-1 at 108.) Despite the pharmacist having spoken with Plaintiff about the importance of adhering to Coumadin, Plaintiff continued to refuse to take it, and

16cv689 BEN (JMA)

thus the medication was discontinued.  (Id.)  Dr. Rodriguez reported that she had been seeing Plaintiff more frequently, but he told her this was causing him more stress; therefore, the team decided that Plaintiff would be seen only for routine mental health follow-up appointments every two or three months.  (Id.)  The team also decided that a nursing wellness visit would be scheduled with Plaintiff to discuss the outcome of the Mega Huddle and to ensure he understood that he could request health care services by using the CDC 7362 form, and that mental health, nursing, and the PCP would continue ongoing communication and collaboration regarding Plaintiff.  (Id. at 108-09.)

On January 26, 2015, Defendant Pasha, the nurse practitioner, noted in Plaintiff's medical file that he had seen his PCP and was still refusing medication. (Id. at 114.)  Plaintiff makes two allegations regarding this appointment:  first, that only qualified high-risk providers, such as a PCP, can attend to high-risk medical inmates such as himself, and second, that Nurse Pasha saw him at Dr. Silva's behest, and falsified his medical record by stating treatment had been rendered when there was no such treatment.  (ECF No. 1 at 20; ECF No. 1-1 at 111-12.) Plaintiff further alleges that Pasha falsified his records again the following day. (ECF No. 1 at 20.)  The progress note dated January 27, 2015, however, indicates that it is a late entry for the prior day's appointment, and also clearly notes that treatment was not rendered due to Plaintiff's refusal.  (ECF No. 1-1 at 116.)  Plaintiff was next seen on February 9, 2015, at which time it was noted that Plaintiff continued to decline all medications and understood the risk of stroke and death.  (ECF No. 1-2 at 3.)  Plaintiff points out that the progress note includes a reference to his having suffered from low back pain for thirty years, for which he alleges he received little to no treatment.  (ECF No. 1 at 20.)

On March 29, 2015, Plaintiff submitted a CDCR 22 form to request a copy of the CDCR 128 form that Sgt. Strickland indicated Plaintiff would receive if Plaintiff refused to write the word "forever" on his refusal of medical treatment

16cv689 BEN (JMA)

form on November 24, 2014, when Strickland accompanied Plaintiff to the B Facility Clinic.  (ECF No. 1 at 20.)  Sgt. Strickland denied Plaintiff's version of events and responded that he did not prepare a 128 form.  (ECF No. 1-2 at 6.)  Plaintiff submitted another CDCR 22 form on April 3, 2015 to find out who had incorrectly summoned him to B Clinic the prior day, and alleged prison staff had been harassing him by falsely paging him for medical appointments.  (ECF No. 1 at 20; ECF No. 1-2 at 8.)  Correctional Officer Ponce replied that Correctional Officer Hampton had received a call to send Plaintiff to the clinic, but could not remember who called, and Ponce was unable to find out who had summoned Plaintiff.  (ECF No. 1-2 at 8.)

On March 29, 2015, Plaintiff completed a Patient-Inmate Health Care Appeal Form (CDCR 602).  (ECF No. 1 at 20; ECF No. 1-2 at 13.)  He alleged unlawful conspiracy, ongoing retaliation, deliberate indifference to a severe condition, and falsification of documents.  (ECF No. 1-2 at 13.)  From his perspective, in 2013/2014, prison staff had attempted to discontinue his pain medication, methadone, by falsely alleging abuse of medications, so he promptly filed a court case (presumably, his habeas petition in July 2014).  (Id.)  Thereafter, he suffered a heart condition due to being forced to take methadone.  (Id.)  Plaintiff was then placed on morphine due to his atrial fibrillation (in August 2014).  (ECF No. 1-2 at 15.)  All of Plaintiff's drug testing showed his drug levels were appropriate, except when an undertrained phlebotomist did not draw sufficient blood for testing (in September 2014).  (Id.)  Plaintiff alleges his morphine was discontinued in retaliation for having filed a court action, and he "likewise refused all further meds. & medical treatment."  (Id.)  The action sought by Plaintiff included:  immediate removal of Defendants Silva, Pasha, and Pool from the B Clinic; immediate reinstatement of all previous medication, including morphine at the "appropriate" level of 30 milligrams three times per day for treatment of his severe back pain and chronic health issues; immediate transfer

to Tri-City Medical Center to be examined by Dr. Matthews; permanent housing in a single cell due to the risk of him "bleeding out" if he restarted medication for atrial defibrillation; immediate investigation into the custody and medical staffs' illegal conspiracy to deprive him of adequate medical care; compensatory damages from all named parties of $1.00 each; punitive damages as determined by a jury; and the full names and titles of the phlebotomists referred to in his appeal. (Id.) Plaintiff's appeal culminated in a Director's Level Decision on October 12, 2015 in which Plaintiff's appeal was denied and his administrative remedies were exhausted. (ECF No. 1-2 at 10-12.)

On July 24, 2015, Defendant Sosa issued a CDC 128-A counseling chrono to document the following language contained in an appeal filed by Plaintiff on June 30, 2015: "Fire these incompetent medical and custody staff. Or in the alternative, place each and every one of them into a job where they cannot violate inmate rights, namely in a supply closet." (Id. at 28.) Plaintiff alleges Sosa issued the chrono in order to "chill redress" and "thwart exhaustion" of his grievances. (ECF No. 1 at 21.)

On August 6, 2015, Plaintiff engaged in a hunger strike to protest not being placed on an appropriate workers list, the loss of $546.08 worth of property, and not being treated for all of his medical ailments. (ECF No. 1 at 21; ECF No. 1-2 at 49.) Defendant Paramo, the Warden, ordered Defendant J. Jackson to intervene. (ECF No. 1 at 21.) On August 28, 2015, the Victims Compensation and Government Claims Board denied Plaintiff's application for leave to present a late claim and rejected the claim itself. (ECF No. 1-2 at 51.) Plaintiff alleges this occurred because appeals staff at RJD refused to allow the timely filing of his CDCR Form 602 grievances. (ECF No. 1 at 22.) On September 3, 2015, Plaintiff presented a CDCR Form 22 to complain that RJD staff−specifically, Defendant Sosa−were incompetent because another inmate's confidential paperwork was attached to a Screen Out form responding to his Form CDCR

16cv689 BEN (JMA)

602 appeal.  (ECF No. 1-2 at 53-54.)

On September 3, 2015, Plaintiff received x-rays of his lumbar spine, referred by Dr. Silva, which showed mild to moderate lumbar arthrosis.  (Id. at 101.)  Plaintiff alleges on November 25 and 28, 2015, he was given unlawful direct orders via Defendants Paramo and Jackson to perform work that he should not have undertaken due to his medical restrictions.  (ECF No. 1 at 22; ECF No. 1-2 at 57, 58.)  On November 25 and December 10, 2015, Plaintiff filled out health care services request forms to report injuries he had sustained while working.  (ECF No. 1 at 23; ECF Nos. 1-2 at 61, 62.)  Plaintiff alleges he was told by an unnamed nurse that "medical" could not and would not do anything for him because he had filed previous grievances.  (ECF No. 1 at 23.)

Plaintiff alleges his CDC 602 Inmate/Parolee Appeal Forms were unlawfully screened out by Defendants Sosa and/or Self, Appeals Coordinators, on five occasions.  (Id. at 23; ECF No. 1-2 at 65-69.)  On December 15, 2015, Plaintiff submitted a request for mental health services, stating, "I am having an extremely difficult time dealing with staff which is causing me a great deal of depression."  (ECF No. 1-2 at 81.)  Plaintiff alleges that his assigned mental health clinician told him to "just stop filing paperwork and kiss some ass by doing whatever staff wanted [him] to do."  (ECF No. 1 at 23.)

On December 1, 2015, Plaintiff underwent MRIs of his spine.  (ECF No. 1-2 at 103, 105, 107.)  On December 24, 2015, he saw Dr. Peyman Shakiba and complained of chronic neck and back pain.  (Id. at 84-84.)  Dr. Shakiba advised Plaintiff that his cervical MRI showed degenerative changes at T3 to C5 and C6 to C7, mild central canal narrowing at C3 to C4 and C4 to C5, and bilateral neural foraminal narrowing at C3 to C5; his thoracic MRI showed mild degenerative changes, and mild central canal narrowing at T11 to T12; and his lumbar MRI showed moderate central canal narrowing at L4 to L5 and mild narrowing at L2 to L4.  (Id.)  Dr. Shikiba noted:

> After I reviewed these results with the patient, he became very upset, feeling that these images are showing that he is better than his previous imaging and he feels this is because these MRIs did not have contrast. So he insists that these MRI readings are inaccurate because he should be worse, not better, than his previous MRI. I tried to explain to him that, if they were [not] good visualizations of the nerves and the spine, the radiologist would have requested an MRI with contrast. The patient again repeated his demand to have fusion of his lumbar spine because he feels this will control his pain. I [asked] him if he would be interested in trying physical therapy; he said he has had physical therapy in the past and epidural and they have never helped him. The patient then stood up and walked out of the examination room.

(Id.) Plaintiff alleges RJD "dummied" his MRI results and that images taken inside prison vary from images taken outside prison; prior MRI and x-ray results from 1998, 2004, 2006, and 2013 are attached to his Complaint. (ECF No. 1 at 24; ECF No. 1-2 at 86-99.) Plaintiff alleges, "[I]t is clear that RJD fraudulently had these [test] results prepared and that CDCR/RJD were involved in an illegal, unconstitutional "shopping around" of medical tests until they could obtain/fabricate test results that mirrored [their] desire to prove cost-effective (none) medical care to my severe known medical conditions." (ECF No. 1 at 25.)

Plaintiff saw Dr. Silva on January 12, 2016 and complained of severe, chronic pain. (ECF No. 1-2 at 108-09.) Dr. Silva noted that Plaintiff continued to refuse treatment for his atrial fibrillation, but appeared well notwithstanding his complaints of severe pain. (Id.) Plaintiff refused neuropathic pain medication other than narcotics, which Dr. Silva indicated were not medically indicated because narcotics were not the best form of treatment for chronic back pain, and because of Plaintiff's prior inconsistent drug testing. (Id. at 109.) Dr. Silva also wrote, "Dr. Matthews has recommended that [Plaintiff] be kept in atrial fibrillation rather than rate control for cost-effective [treatment]." (Id. at 108). Plaintiff points to this as evidence of the CDCR's opinion that it was better for him to "suffer in

16cv689 BEN (JMA)

pain and die" of his medical conditions because appropriate treatment was not cost-effective. (ECF No. 1 at 25.) Dr. Silva continued in his note, "Dr. Matthews thinks that [Plaintiff's] condition is worsening due to the development of cardiomyopathy and feels his condition will only get worse without [treatment]. I relayed this to [Plaintiff] who stated he understood but still refused any treatment." (ECF No. 1-2 at 108.)

Plaintiff asserts the following claims: (1) retaliation in violation of the First Amendment; (2) conspiracy under 42 U.S.C. § 1986 in violation of the First Amendment; (3) deliberate indifference to severe medical condition in violation of the Eighth Amendment; and (4) deliberate indifference to severe medical condition and falsification of medical reports due to cost considerations in violation of the Eighth Amendment. (ECF No. 1 at 26-27.)

## II. LEGAL STANDARDS

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). Because Rule 12(b)(6) focuses on the "sufficiency" of a claim rather than the claim's substantive merits, "a court may [ordinarily] look only at the face of the complaint to decide a motion to dismiss." Van Buskirk v. Cable News Network, Inc., 284 F.3d 977, 980 (9th Cir. 2002). However, courts may consider exhibits that are attached to the complaint. See Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1990) (citing Amfac Mortg. Corp. v. Ariz. Mall of Tempe, Inc., 583 F.2d 426 (9th Cir. 1978) ("[M]aterial which is properly submitted as part of the complaint may be considered" in ruling on a Rule 12(b)(6) motion to dismiss.) Exhibits that contradict the allegations of a complaint may fatally undermine the complaint's allegations. See Sprewell v. Golden State Warriors,

266 F.3d 979, 988 (9th Cir. 2001) (a plaintiff can "plead himself out of a claim by including . . . details contrary to his claims" (citing <u>Steckman v. Hart Brewing, Inc.</u>, 143 F.3d 1293, 1295-96 (9th Cir. 1998) (courts "are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint."))); <u>see also</u> <u>Nat'l Assoc. for the Advancement of Psychoanalysis v. Cal. Bd. of Psychology</u>, 228 F.3d 1043, 1049 (9th Cir. 2000) (courts "may consider facts contained in documents attached to the complaint" to determine whether the complaint states a claim for relief).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the conduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 556, 570 (2007)). "All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." <u>Cahill v. Liberty Mut. Ins. Co.</u>, 80 F.3d 336, 337-38 (9th Cir. 1996) (citation omitted). The court need not, however, "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." <u>Sprewell</u>, 266 F.3d at 988; <u>see</u> <u>also</u> <u>Iqbal</u>, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the defendant-unlawfully-harmed me accusation." <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 555). For a complaint to survive a motion to dismiss, "the non-conclusory 'factual content,' and reasonable inferences [drawn] from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." <u>Moss v. United States Secret Serv.</u>, 572 F.3d 962, 969 (9th Cir. 2009) (quoting <u>Iqbal</u>, 556 U.S. at 678). "Vague and conclusory

16cv689 BEN (JMA)

allegations of official participation in civil rights violations are not sufficient to withstand a motion to dismiss." Ivey v. Bd. of Regents of the Univ. of Alaska, 673 F.2d 266, 268 (9th Cir. 1982).

**III.    DEFENDANTS' MOTIONS**

**A.    Claim Preclusion (CDCR Defendants)**

Defendants Silva, Jackson, Pasha, Walker, Rodriguez, Self, Pool, Glynn, Sosa, Paramo, Roberts, Stout, and Bedane (hereafter collectively the "CDCR Defendants"), relying on Furnace v. Giurbino, 838 F.3d 1019 (9th Cir. 2016), move to dismiss all of Plaintiff's claims as barred by claim preclusion.  In Furnace, the Ninth Circuit held that a petition for writ of habeas corpus filed in California state court can have a claim preclusive effect on a subsequent § 1983 action if the second suit involves: (1) the same cause of action (2) between the same parties or parties in privity with them (3) after a final judgment on the merits in the first suit.  Furnace, 838 F.3d at 1023.

Under the Full Faith and Credit Statute, 28 U.S.C. § 1738, federal courts must give the same preclusive effect to state court judgments, including "reasoned" habeas judgments, as the rendering state court would.  Id.  Under California law, two suits will be found to involve the same cause of action when they involve the same "primary right."  Id. at 1024 (citing Brodheim v. Cry, 584 F.3d 1262, 1268 (9th Cir. 2009)).  Under the primary rights theory, "a cause of action is (1) a primary right possessed by the plaintiff, (2) a corresponding primary duty devolving upon the defendant, and (3) a harm done by the defendant which consists in a breach of such primary right and duty."  Brodheim, 584 F.3d at 1268.

The causes of action in the instant case and the state habeas petition are distinct.  In his state habeas petition, filed on July 21, 2014, Plaintiff complained, among other things, that he was being denied adequate pain medication as his

16cv689 BEN (JMA)

request that his medication be increased to three doses per day had been denied by prison medical staff. (ECF No. 1 at 31-34.) The allegations in this case are much more expansive than those in his habeas petition, and go beyond Plaintiff's allegation of not being provided opiate medication. Plaintiff's Complaint in the instant case includes allegations that Defendants caused Plaintiff's atrial fibrillation heart condition, improperly diagnosed and treated him (including by not providing him adequate pain medication), and conspired to retaliate, and retaliated, against him for filing grievances and a previous lawsuit. Moreover, Plaintiff's federal complaint largely relates to events occurring after the filing of Plaintiff's state habeas petition, and the majority of the defendants named in this action were not named as respondents in his habeas petition, nor did they have any connection to the inadequate pain medication allegation raised therein.[4] "The critical focus of primary rights analysis is the harm suffered." Brodheim, 584 F.3d at 1268. The alleged harms in Plaintiff's state habeas petition and this federal case are distinct, and "were caused at different times, by different acts, and by different actors." See id. at 1268-69. Although Plaintiff's current allegation that he was denied adequate pain medication bears some similarity to the contentions in his habeas petition, Plaintiff's habeas petition is based upon a different set of circumstances and a different time frame than those set forth in his § 1983 complaint. Accordingly, the Court recommends that this action not be found to be barred by the state court's decision on Plaintiff's state habeas

---

[4] The CDCR Defendants' request for judicial notice of Plaintiff's July 21, 2014 state habeas petition is granted. See Rosales-Martinez v. Palmer, 753 F.3d 890, 891 (9th Cir. 2014) (court may take judicial notice of the records and filings of other courts); Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005) (court may consider any documents attached to the complaint or incorporated by reference into the complaint). Plaintiff named the following parties as respondents in his state habeas petition: Edmund G. Brown, Jr., Governor; M.D. Stainer; J. Lewis; Daniel Paramo, Warden; S. Roberts, M.D.; M. Glynn; Tamara S. Robinson, M.D.; and K. Dean, M.D. (ECF No. 46-2 at 10-11.)

16cv689 BEN (JMA)

petition.

**B.    State Actor (Defendant Butcher)**

Defendant Butcher argues that Plaintiff's Complaint fails to plead sufficient facts showing he is a state actor.  "Section 1983 creates a private right of action against individuals who, acting under color of state law, violate federal constitutional or statutory rights."  <u>Devereaux v. Abbey</u>, 263 F.3d 1070, 1074 (9th Cir. 2001).  To establish § 1983 liability, a plaintiff must show both (1) deprivation of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was committed by a person acting under color of state law.  <u>Tsao v. Desert Palace, Inc.</u>, 698 F.2d 1128, 1138 (9th Cir. 2012).  As a general matter, private hospitals  and doctors are not state actors and therefore cannot be sued under § 1983.  <u>See</u> <u>Briley v. California</u>, 564 F.2d 849, 855-56 (9th Cir. 1977).  However, an inmate plaintiff may be able to hold a private hospital or doctor liable if either contracted directly with the state to provide medical services to inmates.  <u>West v. Atkins</u>, 487 U.S. 42, 54 (1988); <u>see</u> <u>also</u> <u>McIlwain v. Prince William Hosp.</u>, 774 F. Supp. 986, 989-90 (E.D. Va. 1991).

Plaintiff alleges that Defendant Butcher is or was "a contract medical doctor with CDC-R/RJD."  <u>See</u> ECF No. 1 at 6.  The Court finds Plaintiff has sufficiently alleged that Defendant Butcher is a state actor.

**C.    Statute of Limitations (Defendant Butcher)**

Defendant Butcher contends Plaintiff's first, third, and fourth claims are time-barred based on California's one-year statute of limitations for actions involving professional negligence against a healthcare provider, set forth in California Code of Civil Procedure § 340.5.  Plaintiff contends a two-year statute of limitations applies.  Opp'n to Butcher Mot., ECF No. 39 at 21.

Dismissal pursuant to Fed. R. Civ. P. 12(b)(6) based on a statute of limitations defense is only appropriate where the running of the statute of limitations is apparent "on the face of a complaint."  <u>Von Saher v. Norton Simon</u>

16cv689 BEN (JMA)

Museum of Art at Pasadena, 592 F.3d 954, 969 (9th Cir. 2010). However, Rule 12(b)(6) permits consideration of any matters of which judicial notice may be taken, and any exhibits attached to the complaint. United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003). As § 1983 contains no specific statute of limitations, federal courts borrow state statutes of limitations for personal injury actions in suits brought pursuant to § 1983. See Wallace v. Kato, 549 U.S. 684, 387 (2007); Lukovsky v. City of San Francisco, 535 F.3d 1044, 1048 (9th Cir. 2008). In California, the statute of limitations for an action for a personal injury caused by the wrongful or negligence act of another is two years from the date of accrual. See Cal. Code Civ. Proc. § 335.1; see also McGee v. Chamberlain, 2014 WL 1028695, *2 (S.D. Cal. Mar. 13, 2014) (applying two-year statute of limitations pursuant to § 335.1 to California prisoner's allegations that he was denied adequate medical care); Bradley v. Jameson, 2013 WL 6504800, *2 (S.D. Cal. Dec. 10, 2013) (same); Calloway v. Scribner, 2013 WL 943229, *2 (E.D. Cal. Mar. 11, 2013) (applying two-year statute of limitations pursuant to § 335.1 to California prisoner's allegations of deliberate indifference to a serious medical need in violation of the Eighth Amendment). Therefore, Defendant Butcher's reliance on California Code of Civil Procedure § 340.5 is misplaced.

Federal law determines when a cause of action accrues and begins to run for a § 1983 claim. Lukovsky, 535 F.3d at 1048. A federal claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action. Id. at 1051. Here, Plaintiff alleges he was seen by Defendant Butcher on or between August 14, 2014 and August 19, 2014. (ECF No. 1 at 14-15; ECF No. 1-1 at 39-40, 46-47.) Assuming for the sake of argument that his cause of action against Defendant Butcher accrued upon these visits, the two-year statute of limitations ran in August 2016. As Plaintiff's Complaint was filed before this, on March 21, 2016, the Court recommends that it not be found to be barred by the statute of limitations.

16cv689 BEN (JMA)

**D.    Plaintiff's First Claim − Retaliation**

Plaintiff asserts a claim of retaliation against all defendants in violation of the First Amendment right to petition the government for redress of grievances. All CDCR Defendants, excluding Silva and Pasha, and Defendants Zamudio and Butcher seek dismissal of this claim pursuant to Fed. R. Civ. P. 12(b)(6) on grounds that Plaintiff fails to state a claim upon which relief can be granted.

Retaliation against a prisoner for exercising his rights to speech or to petition the government may violate the First Amendment. See Rizzo v. Dawson, 778 F.2d 527, 532 (9th Cir. 1985); see also Rhodes v. Robinson, 408 F.3d 559, 597 (9th Cir. 2005) (providing that prisoners have a First Amendment right to file prison grievances and to pursue civil litigation in court and to be free from retaliation from doing so). A claim of First Amendment retaliation requires: (1) "the retaliated-against conduct is protected," (2) the "defendant took adverse action against the plaintiff," (3) there is a "causal connection between the adverse action and the protected conduct," (4) the act "would chill or silence a person of ordinary firmness," and (5) the conduct does not further a legitimate penological interest. See Watison v. Carter, 668 F.3d 1108, 1114 (9th Cir. 2012). A plaintiff can allege retaliatory intent (factor three) with a time line of events from which retaliation can be inferred. Id. If the plaintiff's exercise of his constitutional rights was not chilled (factor four), he must allege the defendant's actions caused him to suffer more than minimal harm. Rhodes, 408 F.3d at 567-68 n.11. Retaliation claims are reviewed with particular care as they are prone to abuse by prisoners. Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).

Plaintiff alleges he engaged in protected conduct–the filing of his state habeas petition and prison grievances. He claims he was retaliated against after engaging in his protected activity by being deemed a "troublemaker," and contends prison staff threatened him, fired him from his assigned job, moved his housing, made false statements about him, directed other inmates to beat him,

placed false documents into his medical file stating he was diverting medication, stole his personal property, placed him in Administrative Segregation, and threatened him with transfer to a higher security prison if he did not cease filing grievances. (ECF No. 1 at 14.) He also alleges his pain medication was discontinued in retaliation for having filed a court action. (ECF No. 1-2 at 15.) Notwithstanding Plaintiff's extensive list of alleged adverse actions, Plaintiff makes very few specific allegations of such actions against any moving defendant; rather, he alleges only generally that "staff" took adverse action against him. <u>See</u> ECF No. 1 at 13-14. This, by itself, is insufficient to state a claim against any defendant. <u>See</u> <u>Taylor v. List</u>, 880 F.2d 1040 (9th Cir. 1989) ("Liability under section 1983 arises only upon a showing of personal participation by the defendant.").

Additionally, none of Plaintiff's factual allegations, detailed above, shows that any of the moving defendants retaliated against Plaintiff. With respect to Defendants Jackson and Paramo, Plaintiff alleges only that Jackson intervened in Plaintiff's hunger strike upon Paramo's orders, and that both ordered Plaintiff to perform work that he should not have undertaken due to his medical restrictions. Even if these could be considered adverse actions, Plaintiff makes no allegation of a causal connection between these actions and his protected conduct, nor does he allege such conduct would chill a person of ordinary firmness or that it lacked legitimate penological interests. A similar analysis applies to Defendants Walker, Glynn, Roberts, and Bedane, against whom Plaintiff alleges only their refusal to provide him with John Doe "Jose's" last name, and to Defendant Stout, whom Plaintiff alleges refused to allow him to work, and ordered him brought to the medical clinic. Plaintiff alleges no facts at all showing that Defendants Rodriguez or Pool retaliated against him.

With respect to Defendants Sosa and Self, Plaintiff alleges Defendant Sosa issued a CDC 128-A custodial counseling chrono in retaliation for Plaintiff's

16cv689 BEN (JMA)

grievances, and that both Sosa and Self unlawfully screened out his appeals. Courts have found that administrative chronos, such as CDC 128-A chronos, which are informational in nature and do not have any disciplinary ramifications, are not a sufficient adverse action to support a retaliation claim. See, e.g., Williams v. Woodford, 2009 WL 3823916, *3 (E.D. Cal. 2009). Plaintiff, in his opposition, contends the CDC 128-A chrono will impact his opportunity to be released on parole. Opp'n to CDCR Mot., ECF No. 56 at 27. However, assuming *arguendo* Plaintiff has adequately pleaded the first four factors of a retaliation claim, including the adverse action factor, he has not alleged the preparation of the chrono, which Sosa used to document incendiary language used by Plaintiff about placing prison staff in a supply closet, was not undertaken to advance legitimate penological purposes, and therefore does not sufficiently state a claim. As for Sosa's and Self's alleged unlawful screening out of Plaintiff's appeals, Plaintiff has not asserted facts establishing a causal connection between his protected conduct and the claimed adverse action. The exhibits attached to Plaintiff's complaint indicate his appeals were screened out because they were missing documentation, failed to state facts supporting his allegations, and raised multiple issues which were required to be appealed separately. (ECF No. 1-2 at 65-69.) Having been presented only with the appeal screening forms and Plaintiff's conclusory allegations that the denial of his appeals was retaliatory, the Court does not find Plaintiff has pled facts sufficient to allow for a plausible inference of retaliatory motive in light of the more likely explanations available. See Iqbal, 556 U.S. at 681.

Plaintiff also fails to state a retaliation claim against Drs. Butcher and Zamudio, the Alvarado Hospital physicians. Plaintiff contends in his opposition papers that Butcher and Zamudio, at the behest of RJD medical staff, refused to provide him pain medication. See Opp'n to Butcher Mot., ECF No. 39 at 13; Opp'n to Zamudio Mot., ECF No. 38 at 10-11. Plaintiff, however, has alleged no

facts demonstrating that Drs. Butcher and Zamudio even knew about his protected conduct, i.e., the filing of his state habeas petition and prison grievances, let alone that their decision to not provide him with pain medication was motivated by retaliation for Plaintiff having exercised his First Amendment rights. See, e.g., Corales v. Bennett, 567 F.3d 554, 568 (9th Cir. 2009) (stating that plaintiff must demonstrate that defendant knew of the protected activity); Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989) (a plaintiff must show that his protected conduct was a "substantial" or "motivating" factor behind the defendant's conduct). Indeed, Plaintiff himself alleges he was denied pain medication at Alvarado Hospital "due to the stated risk of further heart damage." See Compl., ECF No. 1 at 15. Plaintiff also makes no allegations that the physicians prevented him from filing any grievances. In short, Plaintiff has not alleged facts sufficient to allow for a plausible inference of retaliatory motive by Drs. Butcher and Zamudio. See Iqbal, 556 U.S. at 681.

Plaintiff fails to state a claim for retaliation against any of the moving defendants. The Court accordingly recommends the moving defendants' motions to dismiss Plaintiff's first claim be granted.

**E.    Plaintiff's Second Claim – Conspiracy**

Plaintiff alleges that all defendants unlawfully conspired against him in violation of 42 U.S.C. § 1986 in relation to his First Amendment right to petition the government for redress of grievance. All CDCR Defendants, excluding Silva and Pasha, and Defendants Butcher and Zamudio seek dismissal of this claim pursuant to Fed. R. Civ. P. 12(b)(6) on grounds that Plaintiff fails to state a claim upon which relief can be granted.

Section 1986 "authorizes a remedy against state actors who have negligently failed to prevent a conspiracy that would be actionable under [42 U.S.C.] § 1985." Cerrato v. San Francisco Cmty Coll. Dist., 26 F.3d 968, 971 n.7 (9th Cir. 1994). Under section 1985(3), "a complaint must allege (1) a

16cv689 BEN (JMA)

conspiracy, (2) to deprive any person . . . of the equal protection of the laws, or of equal privileges and immunities under the laws, (3) an act by one of the conspirators in furtherance of the conspiracy, and (4) a personal injury, property damage, or deprivation of any right or privilege of a citizen of the United States." Gillespie v. Civiletti, 629 F.2d 637, 641 (9th Cir. 1980); see also Griffin v. Breckenridge, 403 U.S. 88, 102-03 (1971). "The language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." Griffin, 403 U.S. at 102.

Here, Plaintiff's Complaint contains no facts that any of the alleged constitutional violations were based on any "racial, or perhaps otherwise class-based, invidiously discriminatory animus." RK Ventures, Inc. v. City of Seattle, 307 F.3d 1045, 1056 (9th Cir. 2002) (citing Sever v. Alaska Pulp Corp., 978 F.2d 1529, 1536 (9th Cir. 1992)). Therefore, the Court recommends the moving defendants' motions to dismiss Plaintiff's second claim be granted due to the failure to state a claim pursuant to either 42 U.S.C. § 1985 or § 1986 upon which relief can be granted.

**F.     Plaintiff's Third and Fourth Claims – Deliberate Indifference**

Plaintiff's third and fourth claims assert that Defendants conspired with each other to act with deliberate indifference to his severe medical condition and falsified medical reports due to cost considerations in violation of the Eighth Amendment prohibition against cruel and unusual punishment. All CDCR Defendants, excluding Silva and Pasha, and Defendants Zamudio and Butcher seek dismissal of this claim pursuant to Fed. R. Civ. P. 12(b)(6) on grounds that Plaintiff fails to state a claim upon which relief can be granted.

A claim of medical indifference requires (1) a serious medical need and (2) a deliberately indifferent response by the defendant. Jett v. Penner, 439 F.3d 1091. 1096 (9th Cir. 2006). The required showing of deliberate indifference is

16cv689 BEN (JMA)

satisfied when it is established "the official knew of and disregarded a substantial risk of serious harm to [the prisoner's] health or safety." Johnson v. Meltzer, 134 F.3d 1393, 1398 (9th Cir. 1998) (citing Farmer v. Brennan, 511 U.S. 825, 837 (1994)).  Negligence, inadvertence, or differences in medical judgment or opinion do not rise to the level of a constitutional violation.  Jackson v. McIntosh, 90 F.3d 330, 331 (9th Cir. 1996).  "Deliberate indifference is a high legal standard." Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004).  The indifference must be substantial and must rise to a level of "unnecessary and wanton infliction of pain."  Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).

Plaintiff has alleged facts that plausibly show he had serious medical needs.  Taking the allegations in the Complaint as true, he has alleged serious health issues, including atrial fibrillation and neck and back pain.  He has not, however, alleged facts plausibly demonstrating the moving defendants acted with deliberate indifference to his serious medical needs.  While Plaintiff indicates in his opposition that he successfully controlled his high blood pressure condition for over five years, prior to being housed at RJD, and it was not until he allowed RJD staff and their "contract" medical doctors to treat him that he experienced the "dire" effects that he had been warned of (see Opp'n to CDCR Mot., ECF No. 56 at 7-8), his pleading lacks factual allegations necessary to show deliberate indifference.  Plaintiff makes no allegations relating to the denial of medical care or deliberate indifference against Defendants Walker, Self, Pool, Glynn, Sosa, Roberts, or Bedane.  Although Plaintiff argues in his opposition that Roberts, Walker and Glynn are medical executives at RJD and that "[n]o medical action is taken, nor denied, save by permission . . . of these defendants" (id. at 10), Plaintiff does not allege this in his Complaint.  See Schneider v. California Dep't of Corr., 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) (providing that new allegations contained in an opposition are irrelevant for Rule 12(b)(6) purposes).  As to Defendants Paramo and Jackson, Plaintiff alleges only that Jackson intervened

16cv689 BEN (JMA)

in Plaintiff's hunger strike upon Paramo's orders, and that both ordered Plaintiff to perform work that he should not have undertaken due to his medical restrictions. These allegations are insufficient to allow for a plausible inference of the requisite state of mind required to establish deliberate indifference to Plaintiff's serious medical needs. See Iqbal, 556 U.S. at 681. As to Defendant Rodriguez, the psychologist, Plaintiff alleges she told him she had purchased malpractice insurance, that funds for inmate care were being diverted to construction efforts at the prison, and that prison staff were attempting to push Plaintiff into suicide. Even if true, none of these show that Rodriguez was deliberately indifferent to Plaintiff's serious medical needs. The only allegation regarding medical care relating to Defendant Stout is that Stout ordered Plaintiff to be brought to the medical clinic. This does not lend any factual support to a deliberate indifference claim.

Plaintiff argues that Defendants denied him adequate medical care in retaliation for filing grievances and court actions, and because it was not cost-effective to treat his condition. Opp'n to CDCR Mot., ECF No. 56 at 21. He contends in his opposition that Defendants knew of his back, heart, kidney, and chronic pain, yet refused anything but aspirin for treatment, and although Defendants knew of his new onset atrial fibrillation, they failed to treat Plaintiff until it became chronic atrial fibrillation requiring multiple painful surgeries to treat. He argues Defendants knew of his immediate need for medical treatment, but allowed him to suffer in order to allow the contracted doctors, Drs. Butcher and Zamudio, to "bilk the State of California" and "earn more medical fees" once his condition worsened because he needed multiple procedures, not a single procedure. Id. at 22-25. These contentions, however, go beyond the allegations in the Complaint (see Schneider, 151 F.3d at 1197 n.1), and are not supported by the medical records attached to the Complaint.

Plaintiff's medical records show that although he is a difficult patient who

16cv689 BEN (JMA)

declines to take his prescribed medications and who regularly refuses to cooperate with medical staff, which Plaintiff himself acknowledges, he has been seen frequently by medical staff at RJD, and was seen on an emergency basis by Drs. Butcher and Zamudio upon discovery of his atrial fibrillation. The voluminous exhibits and medical records offered by Plaintiff in support of his Complaint show that RJD medical staff and Drs. Butcher and Zamudio acted promptly, carefully, and responsibly when he was treated at both RJD as well as Alvarado Hospital. See Steckman, 143 F.3d at 1295-96 (stating that courts "are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint"). In short, Plaintiff's exhibits belie any plausible claims of deliberate indifference as to any of the moving defendants. Iqbal, 662 U.S. at 678; see also Sprewell, 266 F.3d at 988. Moreover, although Plaintiff claims falsification of his medical records, he offers no facts supporting why and how his medical records were false. Plaintiff does not have an independent right to an accurate prison record. See Hernandez v. Johnston, 833 F.2d 1316, 1319 (9th Cir. 1987).

Finally, a claim of conspiracy requires the existence of an agreement or a meeting of the minds to violate the plaintiff's constitutional rights, and an actual deprivation of those constitutional rights. Avalos v. Baca, 596 F.3d 583, 592 (9th Cir. 2010). Plaintiff alleges no facts suggesting an agreement or common objective among Defendants to violate his rights. See Zemsky v. City of New York, 821 F.2d 148, 151 (2d Cir. 1987) (pro se complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights will not withstand a motion to dismiss); Franklin v. Fox, 312 F.3d 423, 441 (9th Cir. 2001) (quoting United Steel Workers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1541 (9th Cir. 1989)) ("To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy.").

16cv689 BEN (JMA)

A plaintiff must state specific facts, not mere conclusory statements, to support the existence of an alleged conspiracy. <u>Burns v. County of King</u>, 883 F.2d 819, 821 (9th Cir. 1989). Although pro se pleadings are liberally construed, a liberal interpretation of a civil rights complaint may not supply essential elements of the claim that were not initially pled. <u>Ivey v. Board of Regents of Univ. of Alaska</u>, 673 F.2d 819, 821 (9th Cir. 1989). While Plaintiff makes a variety of vague and conclusory allegations of conspiracy, his Complaint fails to set forth the essential facts as to the specific acts of each defendant that support the existence of the claimed conspiracy. <u>Burns</u>, 883 F.2d at 821. Claims based on vague and conclusory allegations, which fail to specify each defendant's role in the alleged conspiracy, are subject to dismissal. <u>Pena v. Gardner</u>, 976 F.2d 469, 471 (9th Cir. 1992).

Accordingly, the Court recommends the moving defendants' motions to dismiss the third and fourth claims be granted.

**IV.    CONCLUSION**

For the reasons set forth above, the Court recommends:

1.    Defendant Zamudio's motion to dismiss (ECF No. 22) be GRANTED;

2.    Defendant Butcher's motion to dismiss (ECF No. 24) be DENIED with respect to his arguments that he is not a state actor and that Plaintiff's first, third, and fourth claims are time-barred by the statute of limitations, but GRANTED in all other respects; and

3.    The motions to dismiss filed by CDCR Defendants Silva, Jackson, Pasha, Walker, Rodriguez, Self, Pool, Glynn, Sosa, Paramo, Roberts and Stout (ECF No. 46), and Defendant Bedane (ECF No. 61) be DENIED as to their argument that Plaintiff's Complaint is barred by claim preclusion; but GRANTED in all other respects as to moving CDCR Defendants (Jackson, Walker, Rodriguez, Self, Pool, Glynn, Sosa, Paramo, Roberts, Stout, and Bedane).

16cv689 BEN (JMA)

This report and recommendation will be submitted to the Honorable Roger T. Benitez, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Any party may file written objections with the Court and serve a copy on all parties on or before July 5, 2017. The document should be captioned "Objections to Report and Recommendation." Any reply to the Objections shall be served and filed on or before July 19, 2017. The parties are advised that failure to file objections within the specified time may waive the right to appeal the district court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED**.

Dated:  June 13, 2017

Honorable Jan M. Adler
United States Magistrate Judge

16cv689 BEN (JMA)